JUDGE DAVID BRIONES

FILED

**IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
EL PASO DIVISION**

2023 AUG 24  AM 11: 42

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY ____ Qm ____
DEPUTY

|  |  |  |
|---|---|---|
| **JOSHUA CACHO,** a Texas resident, | § | |
| | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| v. | § | |
| | § | |
| **UNITED TAX DEFENSE LLC,** a Limited | § | EP23CV0317 |
| Liability Company**,** and **Gary Craig,** a | § | |
| California resident, | § | |
| | § | |
| **Defendants.** | § | |
| | § | |

**PLAINTIFF'S ORIGINAL COMPLAINT**

**PARTIES**

1.      Plaintiff JOSHUA CACHO ("Plaintiff") is a natural person, a resident of the Western

District of Texas, and was present in Texas for the last two calls in this Complaint, in this case in

El Paso County, Texas.

2.      Defendant United Tax Defense LLC ("UTD") is a Limited Liability Company organized

and existing under the laws of California and can be served via registered agent Gary W Craig at

2062 Valley Rd Costa Mesa, California 92627, United States.

3.      Defendant Gary W Craig ("Gary") is a natural person, resident of California, Officer of

UTD, and can be served at 2062 Valley Rd Costa Mesa, California 92627, United States.

4.      John Does 1-18 are telemarketers Defendant UTD and Gary hired and trained to solicit

new tax resolution services at their behest. John Does 1-18 true identities are not known to

Plaintiff and therefore are not servable.

1

## JURISDICTION AND VENUE

**5.**      Jurisdiction. This Court has federal-question subject matter jurisdiction over Plaintiff's

TCPA claims pursuant to 28 U.S.C. § 1331 because the TCPA is a federal statute. *Mims v. Arrow*

*Fin. Servs., LLC*, 565 U.S. 368, 372 (2012).

## PERSONAL JURISDICTION

**6.**      This Court has specific personal jurisdiction over Defendant because they have

repeatedly purposefully placed calls to Texas residents and derived revenue from Texas residents,

and they sell goods and services to Texas residents, including Plaintiff.

**7.**      This Court has supplemental subject matter jurisdiction over Plaintiff's claims arising

under Florida Statutes § 501.059 and § 501.601 and because the claims arise from the same

nucleus of operative fact, i.e., Defendant's telemarketing interactive prerecorded robotic message

calls to Plaintiff and adds little complexity to the case.

## VENUE

**8.**      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1)-(2) because a

substantial part of the events giving rise to the claims—the automated robocalls and sale of

goods and services directed at Texas residents, including the Plaintiff—occurred in this District

and because the Plaintiff resides in this District.

**9.**      This Court has venue over Defendant UTD because the automated robocalls at issue were

sent by or on behalf of the above-named Defendant to Plaintiff, a Texas resident.

## THE TELEPHONE CONSUMER PROTECTION ACT

### OF 1991, 47 U.S.C. § 227

**10.**      In 1991, Congress enacted the TCPA to restrict the use of sophisticated telemarketing

equipment that could target millions of consumers *en masse*. Congress found that these calls

were not only a nuisance and an invasion of privacy to consumers specifically but were also a threat to interstate commerce generally. *See* S. Rep. No. 102-178, at 2-3 (1991), as reprinted in 1991 U.S.C.C.A.N. 1968, 1969-71.

**11.**     The TCPA makes it unlawful "to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using an automatic telephone dialing system or an artificial or prerecorded voice ... to any telephone number assigned to a ... cellular telephone service." 47 U.S.C. § 227(b)(1)(A)(iii).

**12.**     The TCPA makes it unlawful "to initiate any telephone call to any residential telephone line using an artificial or prerecorded voice to deliver a message without the prior express consent of the called party, unless the call is initiated for emergency purposes, is made solely pursuant to the collection of a debt owed to or guaranteed by the United States, or is exempted by rule or order" of the Federal Communication Commission ("FCC"). 47 U.S.C. § 227(b)(1)(B).

**13.**     The TCPA provides a private cause of action to persons who receive calls in violation of § 227(b). 47 U.S.C. § 227(b)(3).

**14.**     Separately, the TCPA bans telemarketing calls without a do-not-call policy available upon demand. 47 U.S.C. § 227(c); 47 C.F.R. § 64.1200(d)(1).[1]

**15.**     The TCPA provides a private cause of action to persons who receive calls in violation of 227(c) or a regulation promulgated there under. 47 U.S.C. § 227(c)(5).

**16.**     According to findings of the FCC, the agency vested by Congress with authority to issue regulations implementing the TCPA, automated or prerecorded telephone calls are a greater

---

[1]*See* Code of Federal Regulations, Title 47, Parts 40 to 60, at 425 (2017) (codifying a June 26, 2003 FCC order).

nuisance and invasion of privacy than live solicitation calls and can be costly and inconvenient.

17.     The FCC also recognizes that "wireless customers are charged for incoming calls whether they pay in advance or after the minutes are used." *In re Rules and Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 18 FCC Rcd. 14014, 14115 ¶ 165 (2003).

18.     The FCC requires "prior express written consent" for all autodialed or prerecorded telemarketing robocalls to wireless numbers and residential lines.  In particular:[A] consumer's written consent to receive telemarketing robocalls must be signed and be sufficient to show that the consumer:  (1) received clear and conspicuous disclosure of the consequences of providing the requested consent, *i.e.*, that the consumer will receive future calls that deliver prerecorded messages by or on behalf of a specific seller; and (2) having received this information, agrees unambiguously to receive such calls at a telephone number the consumer designates. In addition, the written agreement must be obtained without requiring, directly or indirectly, that the agreement be executed as a condition of purchasing any good or service.

19.     *In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*,27 FCC Rcd. 1830, 1844 ¶ 33 (2012) (footnote and internal quotation marks omitted). FCC regulations "generally establish that the party on whose behalf a solicitation is made bears ultimate responsibility for any violations." *In the Matter of Rules and Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 10 FCC Rcd. 12391, 12397 ¶ 13 (1995).

20.     The FCC confirmed this principle in 2013, when it explained that "a seller … may be held vicariously liable under federal common law principles of agency for violations of either section 227(b) or section 227(c) that are committed by third-party telemarketers." *In the Matter of the Joint Petition Filed by Dish Network, LLC*, 28 FCC Rcd. 6574, 6574 ¶ 1 (2013).

21.     Under the TCPA, a text message is a call. *Satterfield v. Simon & Schuster, Inc.*, 569 F.3d

4

946, 951 – 52 (9th Cir. 2009).

**22.**     The TCPA defines an ATDS as "equipment which has the capacity – (A) to store or produce telephone numbers to be called, using a random or sequential umber generator; and (B) to dial such numbers. *Id.* at § 227(a)(1)

**23.**     As to what type of dialing equipment constitutes an ATDS, the TCPA vests to the Federal Communication Commission ("FCC") the responsibility to promulgate regulations implementing the TCPA's requirements. *Id.* at § 227(a)(1).

**24.**     Over the last nineteen years, the FCC has repeatedly recognized that a predictive dialer is an ATDS that is subject to regulation by the TCPA. In its 2003 Order, the FCC also defined a "predictive dialer" holding:

[A] predictive dialer is equipment that dials numbers and, when certain computer software is attached, also assists telemarketers in predicting when a sales agent will be available to take calls. The hardware, when paired with certain software, has the capacity to store or produce numbers and dial those numbers at random, in sequential order, or from a database of numbers. As commenters point out, in most cases, telemarketers program the numbers to be called into the equipment, and the dialer calls them at a rate to ensure that when a consumer answers the phone, a sales person is available to take the call.[1]

**25.**     In 2008, the FCC affirmed "that a predictive dialer constitutes an automatic telephone dialing system and is subject to the TCPA's restrictions on the use of autodialers."[2]

**26.**     A corporate officer involved in the telemarketing at issue may be personally liable under the TCPA. *E.g.*, *Jackson Five Star Catering, Inc. v. Beason*, Case No. 10-10010, 2013 U.S. Dist. LEXIS 159985, at *10 (E.D. Mich. Nov. 8, 2013) ("[M]any courts have held that corporate actors can be individually liable for violating the TCPA where they had direct, personal

participation in or personally authorized the conduct found to have violated the statute." (internal

quotation marks omitted)); *Maryland v. Universal Elections*, 787 F. Supp. 2d 408, 415 – 16 (D.

Md. 2011) ("If an individual acting on behalf of a corporation could avoid individual liability,

the TCPA would lose much of its force.").

## FLORIDA STATUTES § 501.059

27.    Florida Statutes § 501.059 makes it a violation to "make or knowingly allow a telephone

sales call to be made if such call involves an automated system for the selection or dialing of

telephone numbers or the playing of a recorded message when a connection to a number called

without the prior express written consent of the called party." Fla. Stat. § 501.059(8)(a).

28.    A "telephone sales call" is defined as a 'telephone call, text message, voicemail

transmission to a consumer for the purpose of soliciting a sale of any consumer goods or

services, soliciting an extension of credit for consumer goods or services, or obtaining

information that will or may be used for the direct solicitation of a sale of consumer goods or

services or an extension of credit for such purposes." Fla. Stat. § 501.059(j).

29.    "Prior express written consent" means an agreement in writing that: Fla. Stat. §

501.0059(g).

1.    Bears the signature of the called party;

2.    Clearly authorizes the person making or allowing the placement of a telephonic sales

calls by telephone call, text message, or voicemail transmission to deliver or cause to

be delivered to the called party a telephone sales call using an automated system for

the selection or dialing of telephone numbers, the playing of a recorded message

when a connection is completed to a number called, or the transmission of a

prerecorded voicemail;

6

3. Includes the telephone number to which the signatory authorizes a telephonic sales call to be delivered; and

4. Includes a clear and conspicuous disclosure informing the called party that;

    a. By executing the agreement, the called party authorizes the person making or allowing the placement of a telephonic sales call to deliver or cause to be delivered a telephonic sales call to the called party using an automated system for the selection or dialing of telephone numbers or playing of a recorded message when a connection is completed to a number called; and

    b. He or she is not required to directly or indirectly sign the written agreement or to agree to enter into such agreement as a condition of purchasing any property, goods, or services.

**30.**    A person aggrieved by a violation of this section may bring an action to recover actual damages or $500, whichever is greater.  Fla. Stat. § 501.059(10)(a)(2).

**31.**    If the court finds that the Defendant's willfully or knowingly violated this section or rules adopted pursuant to this section, the court may, in its discretion, increase the amount of the award to an amount equal to not more than three times the amount available under paragraph (a). Fla. Stat. § 501.059(10)(a)(2)(b).

**FLORIDA TELEMARKETING ACT**

**32.**    A commercial telephone seller or salesperson making a commercial telephone solicitation call may not use technology that deliberately displays a different caller identification number than the number the call is originating from to conceal the true identity of the caller.  Fla. Stat. § 501.616(7)(b).

**33.**    A commercial telephone seller or salesperson may not transmit more than three

commercial telephone solicitation phone calls from any number to a person over a 24-hour period on the same subject matter or issue, regardless of the phone number used to make the call. Fla. Stat. § 501.616(6)(b).

34.    In addition to any other penalties or remedies provided under law, a person who is injured by a violation of the provisions of this part may bring a civil action for recovery of actual damages and/or punitive damages, including costs, court costs, and attorney's fees.  No provision of this part shall be construed to limit any right or remedy provided under law.  Fla. Stat. § 501.625.

## The Texas Business and Commerce Code § 302.101

35.    The Texas Business and Commerce Code requires sellers to obtain a registration certificate from the Secretary of State in order to make telephone solicitations inside the state of Texas or to residents located in Texas.

36.    The Plaintiff may seek damages of violations of Texas Business and Commerce Code § 302.101 of to $5,000.00 per violation, reasonable costs of prosecuting the action, court costs investigation costs, depositions expenses, witness fees, and attorney's fees.

37.    Texas Business and Commerce code § 302.101 provides a private right of action. A violation of Chapter 302 "is a false, misleading or deceptive act of practice under Subchapter E, Chapter 17" and is enforceable as such: "A public or private right of remedy prescribed by Subchapter E, Chapter 17, may be used to enforce [Chapter 302." Tex. Bus. & Com. Code § 302.303.

38.    The use or employment by any person of a false, misleading, or deceptive act or practice causes "economic damages or damages for mental anguish." Tex. Bus. & Com. Code § 17.50

### FACTUAL ALLEGATIONS

8

**39.**    Plaintiff's personal cell phone ending in 3822 has been registered on the National Do-Not-Call Registry for more than thirty-one (31) days prior to the first call received from Defendant UTD's telemarketers.

**40.**    Plaintiff personally registered the cell phone at issue in this case on the National-Do-Not-Call Registry on September 11, 2022.

**41.**    Plaintiff never asked the National Do-Not-Call Registry administrator to remove him from the National Do-Not-Call Registry and Plaintiff was on the National Do-Not-Call Registry at all times relevant to this Complaint.

**42.**    Plaintiff was residing in Florida from the beginning of time up until July 16, 2023, in which he has been residing in Texas currently.

**43.**    Defendant UTD operates as a tax resolution company.

**44.**    Defendant UTD's telemarketers called Plaintiff at least eighteen (18) times. All calls were prerecorded messages from "Ella – Federal Back Tax Abatement Program…" soliciting Plaintiff for unresolved tax debt services.

**45.**    Upon information and belief Defendant UTD's telemarketers called Plaintiff more times over the last four (4) years that he is currently unaware of without the benefit of Discovery.

**46.**    Upon information and belief Defendant UTD used other marketing agencies to contact Plaintiff over the last four (4) years that Plaintiff is unaware of at this time without the benefit of Discovery.

**47.**    **Call #1, DNC Request #1,** *See Table A,* On March 14, 2023, at 9:42 AM EST Plaintiff received a call with a Restricted Caller ID. Plaintiff answered with a "hello" and was greeted by the "Ella – Federal Back Tax Abatement Program" message.

**48.**    Plaintiff engaged the robot to get to a live representative. Plaintiff waited over five (5)

minutes before being transferred to a live representative to get on the line, once connected Plaintiff told them to not call back and hung up the phone.

49.    Call # 2, DNC Request #2, on March 15, 2023, at 12:56 PM EST, Plaintiff received a call with Restricted Caller ID.  Plaintiff answered with a "hello" and was greeted by the "Ella – Federal Back Tax Abatement Program" message.

50.    Plaintiff engaged the robot to get to a live representative. Plaintiff waited over five (5) minutes before being transferred to a live representative to get on the line, once connected Plaintiff told them to stop calling him and hung up the phone.

51.    Call #3, on Mar 20, 2023, at 11: 39 AM EST, Plaintiff received a call with a Restricted Caller ID. Plaintiff answered with a "hello" and was greeted by the "Ella – Federal Back Tax Abatement Program" message.

52.    Plaintiff hung up the phone after hearing the message.

53.    Call #4, on March 21, 2023, at 9:56 AM EST, Plaintiff received a call with a Restricted Caller ID. Plaintiff answered with a "hello" and was greeted by the "Ella – Federal Back Tax Abatement Program" message.

54.    Plaintiff engaged the robot for the sole purpose of identifying the party(s) responsible for the annoying calls he had been receiving playing the same message.

55.    Plaintiff waited over five (5) minutes before being transferred to a live representative to get on the line. Plaintiff was eventually connected to a telemarketer by the name of Stephanie.

56.    After answering a lot of questions, the telemarketer who identified herself as a "settlement officer", refused to give Plaintiff any further information as she learned his number was on the DNC list.

57.    Plaintiff then was told, the only way he would receive assistance from her "firm" was if

he could provide a number that was not on the national DNC list that she could call him back on. Plaintiff does not have a number that is not registered to the National DNC list and told the telemarketer this. The telemarketer disconnected the line.

**58.**    Calls 5-17, from March 21, 2023 – August 08, 2023, Plaintiff received at least thirteen (13) prerecorded "Ella – Federal Back Tax Abatement Program" message calls.

**59.**    On each of the thirteen calls described in paragraph 58, Plaintiff hung up the phone without being connected to a live telemarketer.

**60.**    Call #18, on August 14, 2023, at 3:56 PM MT, Plaintiff received a call with a Restricted Caller ID. Plaintiff answered with a "hello" and was greeted by the "Ella – Federal Back Tax Abatement Program" message.

**61.**    Plaintiff engaged the robot for the sole purpose of identifying the party(s) responsible for the annoying calls he had been receiving over the last few months playing the same message.

**62.**    Plaintiff waited over five (5) minutes before being transferred to a live representative to get on the line. Plaintiff was eventually connected to a telemarketer by the name of Janice.

**63.**    Janice asked Plaintiff a lot of questions, told Plaintiff she worked for UTD, stated unitedtaxdefense.com was their website, and eventually sent Plaintiff a contract via email from UTD. *See Exhibit A.*

**64.**    Table A below displays the calls received from Defendant UTD.

**Table A**

| <u>NO.</u> | <u>Date</u> | <u>Time</u> | <u>Caller ID</u> | <u>Notes</u> |
|---|---|---|---|---|
| 1 | Mar 14, 2023 | 9:42 AM EST | (877) 959-0975 | prerecorded message - Ella - Federal Back Tax Abatement Program - DNC Request #1 |
| 2 | Mar 15, 2023 | 12:56 PM EST | Restricted | prerecorded message - Ella - Federal Back Tax Abatement Program - DNC Request #2 |

| <u>NO.</u> | <u>Date</u> | <u>Time</u> | <u>Caller ID</u> | <u>Notes</u> |
|---|---|---|---|---|
| 3 | Mar 20, 2023 | 11:39 AM EST | Restricted | prerecorded message - Ella - Federal Back Tax Abatement Program -hung up |
| 4 | Mar 21, 2023 | 9:56 AM EST | Restricted | prerecorded message - Ella - Federal Back Tax Abatement Program - spoke with Stephanie |
| 5 | Mar 21, 2023 | 1:35 PM EST | Restricted | prerecorded message - Ella - Federal Back Tax Abatement Program - hung up |
| 6 | Mar 22, 2023 | 4:58 PM EST | Restricted | prerecorded message - Ella - Federal Back Tax Abatement Program - hung up |
| 7 | Mar 22, 2023 | 6:55 PM EST | Restricted | prerecorded message - Ella - Federal Back Tax Abatement Program - hung up |
| 8 | Apr 10, 2023 | 6:45 PM EST | Restricted | prerecorded message - Ella - Federal Back Tax Abatement Program - hung up |
| 9 | Apr 11, 2023 | 1:33 PM EST | Restricted | prerecorded message - Ella - Federal Back Tax Abatement Program - hung up |
| 10 | May 04, 2023 | 4:43 PM EST | Restricted | prerecorded message - Ella - Federal Back Tax Abatement Program - hung up |
| 11 | Jun 15, 2023 | 5:02 PM EST | Restricted | prerecorded message - Ella - Federal Back Tax Abatement Program - hung up |
| 12 | Jun 22, 2023 | 4:53 PM EST | Restricted | prerecorded message - Ella - Federal Back Tax Abatement Program - hung up |
| 13 | Jun 28, 2023 | 4:52 PM EST | Restricted | prerecorded message - Ella - Federal Back Tax Abatement Program - hung up |
| 14 | Jul 05, 2023 | 3:48 PM EST | Restricted | prerecorded message - Ella - Federal Back Tax Abatement Program - hung up |
| 15 | Aug 07, 2023 | 3:57 PM MT | Restricted | prerecorded message - Ella - Federal Back Tax Abatement Program - hung up |
| 16 | Aug 08, 2023 | 11:11 AM MT | Restricted | prerecorded message - Ella - Federal Back Tax Abatement Program - hung up |
| 17 | Aug 08, 2023 | 2:57 PM | Restricted | prerecorded message - Ella - Federal Back |

| NO. | Date | Time | Caller ID | Notes |
|---|---|---|---|---|
| | | MT | | Tax Abatement Program - hung up |
| 18 | Aug 14, 2023 | 3:56 PM MT | Restricted | prerecorded message - Ella - Federal Back Tax Abatement Program - Spoke with Janice - received contract through email |

65.    Plaintiff did not have an established business relationship with Defendant UTD, nor did Plaintiff consent to the calls sent to his personal phone.

66.    Each and every solicitation call from Defendant UTD after March 14, 2023, was a knowing and willful violation of the TCPA as Plaintiff had Delivered a DNC request to Defendant Resolve on March 14, 2023.

67.    Each and every call phone call between March 15, 2023, and August 14, 2023, was a knowing and willful violation as Plaintiff had informed Defendant UTD's telemarketers to stop calling.

68.    Plaintiff did not provide his phone number to Defendant UTD or their telemarketers at any point.

69.    Upon information and belief, Defendant UTD did not have a written do-not-call policy while their telemarketers were sending Plaintiff the calls.

70.    Upon information and belief, Defendant UTD did not train their employees who engaged in telemarketing on the existence and use of any do-not-call list.

71.    Such conduct violates the TCPA and its implementing regulations, 47 CFR § 64.1200(d)(3) (requiring telemarketers to honor and record DNC requests when made).

72.    UTD knew or should have known the requirements for making TCPA-

compliant telemarketing calls and thus knew or should have known that the calls

complained of herein violated the TCPA and its regulations.

73.    Defendant knew or should have known the requirements for making TCPA, FTSA, and

Texas sales compliant telemarketing calls and thus knew or should have known that the

unauthorized telemarketing calls and the many disregarded DNC requests complained of herein

violated the TCPA, FTSA, Texas Business Commerce Code 302.101 and all of their regulations.

74.    No emergency necessitated these calls.

### DEFENDANT GARY IS PERSONALLY LIABLE

75.    If the officer directly participated in or authorized the statutory violation, even

though acting on behalf of the corporation, he may be personally liable. See *United States v*

*Pollution Serv. Of Oswego, Inc.,*763 F.2d133, 134-135 (2ndCir.1985).

76.    The "well-settled" tort rule provides that "when corporate officers directly

participate in or authorized the commission of a wrongful act, even if the act is done on

behalf of the corporation, they may be personally liable. "*General Motors Acceptance Corp.*

*v. Bates,*954 F.2d 1081, 1085(5thCir. 1992). The Fifth Circuit has elaborated that" the thrust

of the general [tort] rule is that the officer to be held personally liable must have some

direct, personal participation in the tort, as where the defendant was the 'guiding spirit'

behind the wrongful conduct or the 'central figure' in the challenged corporate activity.

"Mozingo v. Correct Mfg. Corp., 752 F.2d 168, 174 (5thcirt. 1985) (Citing Escude Cruz v.

Ortho Pharmaceutical Corp., 619 F.2d902,907 (P[1] Cir.1980)) (Citing Texas v. American

Blastfax Inc.,164F.Supp. 2d892 (W.D. Tex. 2001).

77.    Quoting Texas v. American Blastfax:

The Court finds the above principles applicable to the TCPA that is,

14

an officer maybe personally liable under the TCPA if he had direct, personal participation in or personally authorized the conduct found to have violated the statute, and was not merely tangentially involved. Individuals who directly (and here, knowingly and willfully) violate the TCPA should not escape liability solely because they are corporate officers. As the State persuasive argues, to hold otherwise would allow the individual defendants to simply dissolve Blastfax, set-up a new shell corporation, and repeat their conduct. Congress surely did not intend to permit such a result in passing the TCPA.

To be clear, the Court finds Greg and Michael Horne were the "guiding spirits" and the "central figures" behind the TCPA violations. They were the two persons who controlled all of Blastfax's day-to-day operations. They both had direct, personal involvement in and ultimate control over every aspect of Blastfax's wrongful conduct that violate the TCPA, and/or directly controlled and authorized this conduct. And they did so with their eyes and pocketbooks wide open. After October 5,2000, Greg and Michael Horne had good reason to believe they were running a business that violated the TCPA. On February 9, 2001, they knew they were. Yet they continued to direct their company to send unsolicited intrastate fax advertisements. This is far more than a simple derivative liability case. Accordingly, the Court *899 holds defendants Greg and Michael Horne are jointly and severally liable with Defendant Blastfax, Inc., for all TCPA damages in this lawsuit. *See Texas v. American Blastfax, Inc., 164 F. Supp. 2d 892 (W.D. Tex. 2001).*

78.    The Same Court held that corporate officers were also personally liable for DTPA

violations:

The State contends Greg and Michael Horne are personally liable for any DTPA damages because they were solely responsible for the violating conduct.... For the same reasons discussed in finding the individual defendants personally liable under the TCPA, the Court agrees. See, e.g., *Barclay v.Johnson,*686S.W.2d 334,336-37 (Tex. Civ. App.-Houston [1ST Dist.] 1985, no writ) (finding personal liability for corporate officer in DTPA misrepresentation claim, based on general rule that "a corporate agent knowingly participating in a tortious of fraudulent act may beheld individually liable, even though he performed the act as an agent for the corporation Accordingly, the Court finds defendants American Blastfax,Inc., Greg Home and Michael Home are jointly and severally liable for $6,000

in damages for their violations of the DTPA." *Texas v. American Blastfax, Inc.,*164F.Supp. 2d 892 (W.D. Tex. 2001).

79.     At all times material to the Complaint, acting alone or in concert with others Defendant Gary has formulated, directed, controlled, had the authority to control, or participated in the acts and practices of Defendant UDP including the acts or practices set forth in this Complaint.

80.     Defendant Gary is the principal officer of Defendant UDP and controls the day-to-day operations of said Defendant, and directed their employees, agents, salespersons, and solicitors to make TCPA-violating phone calls and to solicit "tax resolutions" sales and services.

81.     Defendant Gary approved the telemarketing scripts and directed the illegal calls to be made.

82.     Defendant Gary is not a mere bystander. She is the mastermind that schemed, planned, directed, initiated, and controlled illegal and fraudulent behavior.

83.     Defendant Gary is well aware Defendant UDP's conduct violated the TCPA and refused to alter their behavior. Defendant Gary is the sole director of UDP and the only person with the power to make unlawful, fraudulent, and unethical behavior stop. Yet, he has taken no steps to stop the behavior. Defendant Gary breaks the law with his eyes wide open.

84.     Defendant Gary and Defendant UDP should be held jointly and collectively liable for the TCPA violations because they actually committed the conduct that violated the TCPA and/or they actively oversaw and directed this conduct.

## **INJURY, HARM, DAMAGES, and ACTUAL DAMAGES**

## AS A RESULT OF THE CALLS

**85.**    Defendant UTD's calls harmed Plaintiff by causing the very harm that Congress sought to prevent—a "nuisance and invasion of privacy."

**86.**    Defendant UTD's calls harmed Plaintiff by trespassing upon and interfering with Plaintiff's rights and interests in Plaintiff's cellular telephone.

**87.**    Defendant UTD's calls harmed Plaintiff by intruding upon Plaintiff's seclusion.

**88.**    Plaintiff has been harmed, injured, and damaged by the calls including, but not limited to: reduced device storage, reduced data plan usage, anger, frustration, invasion of privacy, and more frequent charging of Plaintiff's cell phone.

## PLAINTIFF'S CELL PHONE IS A RESIDENTIAL NUMBER

**89.**    The calls were to Plaintiff's cellular phone number 407-577-3822 which is Plaintiff's personal phone that he uses for personal, family, and household use. Plaintiff maintains no landline phones at his residence and has not done so for at least 15 years and primarily relies on cellular phones to communicate with friends and family. Plaintiff also uses his cell phone for navigation purposes, sending and receiving emails, timing food when cooking, and sending and receiving text messages. Plaintiff further has his cell phone registered in his personal name, pays the cell phone from his personal accounts, and the phone is not primarily used for any business purpose.

### CAUSES OF ACTION:

### COUNT ONE:
**(Violations of the TCPA, 47 U.S.C. § 227(b)(1)(A)(iii), by Automated Telemarketing Without Prior Express Written Consent (Against All Defendants)**

90.     Plaintiff re-alleges and re-adopts paragraphs 1 through 89 of the Complaint as if fully set forth herein.

91.     Defendants violated the TCPA, 47 U.S.C. § 227(b)(1)(A)(iii), at least seven (7) times by placing non-emergency telemarketing automated calls to Plaintiff's cellular telephone number using an automatic telephone dialing system without prior express written consent.

92.     Plaintiff was statutorily damaged at least eighteen (18) times under 47 U.S.C. § 227(b)(3)(B) by Defendants by the calls described above, in the amount of $500.00 per call.

93.     Plaintiff was further statutorily damaged because Defendants willfully or knowingly violated this subsection of the TCPA. Plaintiff requests that the court treble the damage amount to $1,500.00 as permitted under U.S.C. § 227(b)(3)(C) for each and every willful and/or knowing violation.

94.     Plaintiff is also entitled to and does seek an injunction prohibiting Defendant UTD and Defendant Gary, their affiliates, and agents from violating the TCPA, 47 U.S.C. § 227(b)(1)(A)(iii), by placing non-emergency automated prerecorded telemarketing calls to any cellular telephone number without prior express written consent.

## COUNT TWO:

### (Violation of the TCPA "Sales Call/DNC" Prohibition, 47 U.S.C. 227(c), and 47 C.F.R. § 64.1200(C))
### (Against All Defendants)

95.     Plaintiff incorporates the preceding paragraphs 1-89 as if fully set forth herein.

96.     Defendant UTD's telemarketers called Plaintiff's private residential telephone number which was successfully registered on the National Do-Not-Call Registry more than

thirty-one (31) days prior to the calls, for the purposes of commercial solicitation, in violation of 47 U.S.C. § 227(c)(3)(F), and 47 C.F.R. § 64.1200(c)(2).

97.      Plaintiff was statutorily damaged at least eighteen (18) times under 47 U.S.C. § 227(c)(3)(F) by Defendants UTD and Gary by the telemarketing robocalls described above, in the amount of $500.00 per call.

98.      Plaintiff was further statutorily damaged because Defendants UTD and Gary willfully and/ or knowingly violated this subsection of the TCPA. Plaintiff requests that the court treble the damage amount as permitted under U.S.C. § 227(c)(5) for each and every willful and/or knowing violation.

99.      Plaintiff is entitled to an award up to $1,500 in damages for each knowing or willful violation of 47 U.S.C. § 227(c)(3)(F).

**COUNT THREE:**

**Telemarketing Without Mandated Safeguards, 47 C.F.R. § 64.1200(d)**

**(Against All Defendants)**

100.     Plaintiff incorporates the preceding paragraphs 1-89 as if fully set forth herein.

101.     The foregoing acts and omissions of Defendants UTD and Gary and/or their affiliates or agents constitute multiple violations of FCC regulations by making telemarketing solicitations despite lacking the following:

    a.  A written policy, available upon demand, for maintaining a do-not-call list, in violation of 47 C.F.R. § 64.1200(d)(1)[2]

    b.  Training for the individuals involved in the telemarketing on the existence of

---

[2] *See id.* at 425 (codifying a June 26, 2003 FCC order).

and use of a do-not-call list, in violation of 47 C.F.R. § 64.1200(d)(2)[3]; and,

    c.  In the solicitations, the name of the individual caller and the name of the person or entity on whose behalf the call is being made, in violation of 47 C.F.R. § 64.1200(d)(4).[4]

**102.**    Plaintiff is entitled to an award of at least $500 in damages for each such violation. 47 U.S.C. § 227(c)(5)(B).

**103.**    Plaintiff is entitled to an award of up to $1,500 in damages for each such knowing or willful violation. 47 U.S.C. § 227(c)(5).

## COUNT FOUR:

### (Violations of Florida Statutes § 501.059)
### (Against All Defendants)

**104.**    Plaintiff incorporates the preceding paragraphs 1-89 as if fully set forth herein.

**105.**    Defendants UTD and Gary and/or their affiliates and authorized representatives called Plaintiff using automated means without Plaintiff's express written consent. Fla. Stat. § 501.059(8)(a).

**106.**    Defendants UTD and Gary did not have Plaintiff's prior express written consent when making the telephonic solicitation calls. Fla. Stat. § 501.059(1)(g).

**107.**    Plaintiff is entitled to an award of at least $500 in damages for each such violation of Fla. Stat. § 501.059(8)a) pursuant to Fla. Stat. § 501.059(10)(a)(2).

**108.**    Plaintiff is entitled to an award of up to $1,500 in damages for each such knowing or willful violation. Fla. Stat. § 501.059(10)(a)(b).

---

[3] *See id.* at 425 (codifying a June 26, 2003 FCC order).
[4] *See id.* at 425 (codifying a June 26, 2003 FCC order).

## COUNT FIVE:

### (Violations of Florida TELEMARKETING ACT)
### (Against All Defendants)

**109.** Plaintiff incorporates the preceding paragraphs 1-89 as if fully set forth herein.

**110.** Defendant UTD called Plaintiff more than three times within a 24-hour period. Fla. Stat. 501.616(6)(b).

**111.** Defendant UTD and/or their affiliates and authorized representatives called Plaintiff using automated dialing equipment that intentionally transmitted false caller identification information. Fla. Stat. 501.616(7)(b).

**112.** In addition to any other penalties or remedies provided under law, a person who is injured by a violation of the provisions of this part may bring a civil action for recovery of actual damages and/or penalties and/or punitive damages, including costs, court costs, attorney's fees. No provision of this part shall be construed to limit any right or remedy provided under law. Fla. Stat. 501.625.

### COUNT SIX
### (Violations of Texas Business and Commerce Code 302.101)
### Failure to obtain a Telephone Solicitation Registration Certificate
### (Against All Defendants)

**113.** Plaintiff incorporates the preceding paragraphs 1-89 as if fully set forth herein.

**114.** Defendants and/or their affiliates or agents made at least four (4) solicitation sales calls to Plaintiff without having a valid telephone solicitation as required under Tex. Bus. Com. Code 302.

**115.** As a result of Defendants' and/or their affiliates or agents' violations of Tex. Bus. and Com. Code 302.101 Plaintiff may seek damages of up to $5,000 for each violation. Tex. Bus.

and Com. Code 302.302(a).

**116.**    As a result of Defendant's and/or their affiliates or agents' violations of Tex. Bus. and

Com. Code 302.101 Plaintiff may seek all reasonable costs of prosecuting this action, including

court costs, deposition costs, and witness fees.  Tex. Bus. and Com. Code 302.302(d

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Joshua Cacho prays for judgment against Defendants UTD

and Gary Jointly and severally as follows:

A.    Leave to amend this Complaint to name additional DOESs as they are

identified and to conform to the evidence presented at trial;

B.    A declaration that actions complained of herein by Defendants violates the

TCPA and Fla. Stat. 501.059 and Florida Telemarketing Act;

C.    An award of $1500 per call in statutory damages arising from the TCPA 47

U.S.C §227(b) intentional violations jointly and severally against the corporations for

18 calls

D.    An award of $1500 per call in statutory damages arising from the TCPA 47

U.S.C §227(c) intentional violations jointly and severally against the corporations for

18 calls.

E.    An award of $1500 per call in statutory damages arising from the TCPA 47

U.S.C § 227(c)(5) intentional violations jointly and severally against the corporations

for 18 calls.

F.    An award of $1,500 per call in statutory damages arising from Fla. Stat. §

501.059(1)(g) intentional violations, pursuant to Fla. Stat. § 501.059(10)(a)(b) for

14 calls.

G.      An award of $1,500 in statutory damages arising from violations of the Texas Business and Commerce code 305.053 intentional violations jointly and severally against the corporation for four (4) calls.

H.      An award of $50,000 in punitive damages arising from intentional violations of Fla. Stat. 501.616(6)(b).

I.      An award of $50,000 in punitive damages arising from intentional violations of Fla. Stat. 501.616(7)(b).

J.      An award of $5,000 in statutory damages arising from violations of the Texas Business and Commerce code 302.101 intentional violations jointly and severally against the corporation for four (4) calls

K.      An award to Plaintiff of interest, costs, and attorneys' fees, as allowed by law and equity.

L.      Such further relief as the Court deems necessary, just, and proper.

## JURY DEMAND

Plaintiff requests a trial by jury of all claims that can be so tried.

August 21, 2023,

Respectfully,

Joshua Cacho
Plaintiff, Pro Se
164 Estella Rd
Lake Mary, Florida 32746

23

407-577-3822
Jcacho1848@gmail.com